UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANK DAVID SEINFELD,

                   Plaintiff,

    - against -

HANS W. BECHERER, GORDON M. BETHUNE,
JAIME CHICO PARDO, ANN M. FUDGE,
JAMES J. HOWARD, BRUCE KARATZ, RUSSELL
E. PALMER, IVAN G. SEIDENBERG, MARSHALL
N. CARTER, DAVID M. COTE, ROBERT P.
LUCIANO, JOHN R. STAFFORD, MICHAEL W.
WRIGHT, and HONEYWELL INTERNATIONAL, INC.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.:
03-CV-5225 (KSH)(PS)

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Dwight Yellen, Esq.
BALLON STOLL BADER & NADLER, P.C.
1450 Broadway – 14th Floor
New York, New York 10018
(212) 575-7900

Of Counsel:

A. Arnold Gershon P.C.
1450 Broadway, 14th Floor
New York, New York 10018
T: (212) 575-7900
F: (212) 764-5060
       Attorneys for Plaintiff, Frank David Seinfeld

April 27, 2004

## TABLE OF CONTENTS

Table of Cases and Authorities ............................................................................................. (iii)-(ix)

STATEMENT OF THE CASE ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 1

THE MOTION TO DISMISS ............................................................................................. 5

**ARGUMENT**

I.   **"DO NOT MAKE A DEMAND," WARN THE COURTS
     ABOUT DELAWARE CORPORATIONS** ................................................................ 6

II.  **THE COMPLAINT PROPERLY ALLEGES
      THAT DEMAND IS EXCUSED** ............................................................................ 7

III. **THE PROXY STATEMENT IS MATERIALLY
     INCOMPLETE, INADEQUATE, FALSE, AND
     MISLEADING, FOR IT OMITS TO DISCLOSE
     THE NUMBER OF SHARES UNDERLYING
     OPTIONS AND OTHER AWARDS IN THE PLAN,
     AND THE COST OF THE PLAN** ........................................................................... 9

     A.   The Proxy Statement Must
          Disclose The Number Of Options ...................................................................... 11

          1.   The Omission from the Proxy Statement Of The
               Number of Shares Underlying Options And
               Other Awards Violates the Express Requirement Of
               SEC Regulations and Renders It Materially Deficient ............................. 11

          2.   The Proxy Statement is Materially False and Misleading
               Concerning the Number of Shares .......................................................... 14

          3.   Even Without Regard to Express Rules
               Requiring Disclosure, Courts Have
               Treated the Number of Shares
               Underlying Options as Material ............................................................. 17

B.     At Bar, The Proxy Statement Must Disclose
The Cost Of The Plan, Even If Courts Were
Were Correct In Holding That, As A
General Rule, There Is No Such Requirement ...................................................... 19

C.     This Court Should Decline
To Follow The Second And Ninth
Circuits' Holdings That A Proxy
Statement Can Omit The Cost Of
A Stock Option Plan ............................................................................................ 23

IV.     THE COMPLAINT COMPLIES WITH
THE PLEADING STANDARDS ..................................................................................... 25

CONCLUSION ............................................................................................................................. 29

## TABLE OF CASES AND AUTHORITIES

Page

*Abrams v. Koether,* .................................................................................................................. 7
    1992 WL 295195 (D.N.J. 1992)
    766 F.Supp. 237(D.N.J. 1991)

*In re Anderson Clayton Sh.Lit.,* ............................................................................................. 8
    519 A.2d 669 (Del.Ch. 1986)

*A.W. v. Jersey City Public Schools,* ......................................................................................... 17
    2002 WL 1065685 (D.N.J. 2002),
    <u>aff'd.</u>. 341 F.3d 234 (3rd Cir. 2003)

*Blashand v. Rales,*
    971 F.2d 1034 (3rd Cir. 1992) ................................................................................. 7, 8

*Broad v. Rockwell International Corp.,*
    642 F.2d 929 (5th Cir.) <u>cert.</u> <u>denied,</u>
    454 U.S. 965 (1981) ................................................................................................ 18

*Charles Hughes & Co. v. SEC,*
    139 F.2d 434 (2nd Cir. 1943) ................................................................................. 15

*Cheney R. Co. v. ICC,*
    902 F.2d 66 (D.C. Cir. 1990) ................................................................................. 24

*Cohen v. Calloway,*
    667 N.Y.S.2d 249 (1st Dept. 1998) ....................................................................... 18, 20

*Coyer v. Hemmer,*
    901 F. Supp. 872 (D.N.J. 1995) ............................................................................... 7

*In re Craftmatic Sec.Lit.,*
    890 F.2d 628 (3rd Cir. 1989) .......................................................................... 9, 15, 27
*Denton v. Hernandez,*
    504 U.S. 25, 112 S. Ct. 1728 (1992) ....................................................................... 17

*EP Medsystems, Inc. v. Ecocath, Inc.,*
    235 F.3d 865 (3rd Cir. 2000) .......................................................................... 26, 27

*Freedman v. Barrow,*
    427 F. Supp. 1129 (S.D.N.Y. 1976) ....................................................................... 16

*Galef v. Alexander,*
  615 F.2d 51 (2nd Cir. 1980) ................................................................... 1, 8, 11, 15, 21, 25

*Galef v. Alexander,*
  1979 U.S. Dist. LEXIS 14856 ................................................................................ 14, 16

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2nd Cir. 2000) ..................................................................................... 9, 15

*Gediman v. Anheuser Busch, Inc.,*
  299 F.2d 537 (1962) ......................................................................................................... 15

*Gerstle v. Gamble-Skogmo, Inc.,*
  478 F.2d 1281 (2nd Cir. 1973) ....................................................................................... 27

*Gould v. American-Hawaiian S.S. Co.,* ....................................................................... 27
  351 F. Supp. 853 (D.Del. 1972), affd.,
  535 F.2d 761 (3rd Cir. 1976)

*Gould v. American-Hawaiian S.S. Co.,*
  535 F.2d 761 (3rd Cir. 1976) ......................................................................................... 26

*Hart v. Massanari,*
  266 F.3d 1155 (9th Cir. 2001) ....................................................................................... 10

*Herskowitz v. Nutri-System, Inc.,*
  857 F.2d 179 (3rd Cir. 1988),
  cert. denied, 489 U.S. 1054, 489 U.S. 1060 (1989) ......................................................... 27

*Houbigant, Inc. v. Deloitte & Touche, LLP,*
  753 N.Y.S.2d 493 (1st Dept. 2003) ............................................................................. 9, 25

*J.I. Case Co. v. Borak,*
  377 U.S. 426, 84 S. Ct. 1555 (1964) ................................................................................. 8

*Kahn v. Wein,*
  842 F. Supp. 667 (S.D.N.Y. 1994) .................................................................................. 16

*Kamen v. Kemper Financial Services, Inc.,*
  500 U.S. 90 (1991) ............................................................................................................ 7

*Koppel v. 4987 Corp.,*
  167 F.3d 125 (2nd Cir. 1999) ......................................................................... 9, 15, 16, 22

*Korwek v. Hunt,*
    827 F.2d 874 (2d Cir. 1987) ............................................................................................. 10

*Kost v. Kozakiewicz,*
    1 F.3d 176 (3rd Cir. 1993) ............................................................................................... 16

*Krauth v. Executive Telecard, Ltd.,*
    890 F. Supp. 269 (S.D.N.Y. 1995) ................................................................................. 16

*Lewis v. Vogelstein,*
    699 A.2d 327 (Del.Ch. 1997) ......................................................................................... 19

*Maldonado v. Flynn,*
    597 F.2d 789 (2d Cir. 1979) ..................................................................................... 11, 24

*In re NAHC, Inc. Sec.Lit.,*
    306 F.3d 1314 (3rd Cir. 2002) ....................................................................................... 27

*Neitzke v. Williams,*
    490 U.S. 319, 109 S. Ct. 1827 (1989) ........................................................................... 17

*No. 84 Employer Teamster Fund v. America West Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ...................................................................................... 9, 25

*Papasan v. Allain,*
    479 U.S. 265, 106 S. Ct. 2932 (1986) ........................................................................... 16

*In re Prison Realty Sec. Lit.,*
    117 F. Supp. 2d 681 (M.D. Tenn. 2000) ....................................................................... 28

*Prudent Real Estate Trust v. Johncamp Realty, Inc.,*
    599 F.2d 1140 (2nd Cir.1979) ........................................................................................ 13

*RCM Securities Fund, Inc. v. Stanton,*
    928 F.2d 1318 (2nd Cir. 1991) ..................................................................................... 6, 7

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993), quoting
    *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984) ................................................................... 7

*Reiss v. Financial Performance Corp.,*
    738 N.Y.S.2d 658 (N.Y. 2001) ....................................................................................... 18

*Reo v. U.S. Postal Service,*
    98 F.3d 73 (3rd Cir. 1996) ............................................................................................... 7

v

*Resnik v. Swartz,*
 303 F.3d 147 (2nd Cir. 2002) ............................................................ 12, 17, 19, 20, 21, 23

*Resnik v. Swartz,*
 2001 WL 15671 (S.D.N.Y. 2001) ............................................................ 18, 20

*Richland v. Crandall,*
 262 F. Supp. 538 (S.D.N.Y. 1967) ............................................................ 27

*In re Rockefeller Center Properties, Inc. Sec.Lit.,*
 311 F.3d 198 (3rd Cir. 2002) ............................................................ 28

*Salit v. Stanley Works,*
 802 F. Supp. 728 (D. Conn. 1992) ............................................................ 28

*Sec. of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc.,*
 900 F.2d 318 (D.C. Cir. 1990) ............................................................ 24

*Seinfeld v. Bartz,*
 2002 WL 243597 (N.D. Cal. 2002) aff'd., ........................................ 18, 20, 23
 322 F.3d 693, 695, 698 (9th Cir. 2003),
 *certiorari denied,* _____U.S._____, 124 S.Ct. 132 (2003)

*Shaev v. Saper,*
 320 F.3d 373 (3rd Cir. 2003) ............................................................ 9, 13, 15, 16, 23

*Shook v. D.C. Financial Responsibility & Management Asst. Authority,*
 132 F.3d 775 (D.C. Cir. 1998) ............................................................ 24

*South Camden Citizens in Action v. New Jersey D.E.P.,*
 254 F. Supp. 2d 486 (D.N.J. 2003) ............................................................ 17

*Spiegel v. Buntrock,*
 571 A.2d 767 (Del. 1990) ............................................................ 6

*Swierkiewicz v. Sorema N.A.,*
 534 U.S. 506, 122 S. Ct. 992 (2002) ............................................................ 17 C.F.R. §

*In re 3Com Corp. Shareholders Lit.,*
 1999 WL 1009210 (Del.Ch. 1999) ............................................................ 18, 20

*Shaev v. Claflin,*
 2001 WL 548567 (N.D. Cal 2001) ............................................................ 18

*Shaev v. Hampel*,
    2002 WL 31413805 (S.D.N.Y. 2002)
    <u>aff'd by summary order</u>
    203 WL 22139567 ............................................................................................... 13, 14, 20

*Shaev v. Hampel*,
    2003 WL 22139567 (2nd Cir. 2003) ........................................................................ 10, 21

*Tobias Holdings, Inc. v. Bank United Corp.*,
    177 F. Supp. 2d 162 (S.D.N.Y. 2001) ............................................................................. 26

*In re Tri-Star Pictures, Inc. Lit.*,
    1990 WL 82734 (Del.Ch. 1990) ....................................................................................... 8

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ........................................................................................................ 20

*In re U.S. West, Inc. Sec.Lit.* ............................................................................................ 27
    2003 WL 21246539 (3rd Cir. 2003)

*Vides v. Amelio*,
    265 F. Supp. 2d 273 (S.D.N.Y. 2003) .............................................................................. 8

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ........................................................................................................ 9

*In re Warfarin Sodium Antitrust Lit.*,
    214 F.3d 395 (3rd Cir. 2000) .............................................................................. 15, 16, 22

*In re Westinghouse Sec.Lit.*,
    90 F.3d 606 (3rd Cir. 1996) ............................................................................................ 15

*In re Westinghouse Sec.Lit.*,
    832 F. Supp. 989 (W.D.Pa. 1993) .................................................................................... 8

*Wilson v. Great American Industries*,
    855 F.2d 987 (2nd Cir. 1988) .......................................................................................... 27

*Zell v. Intercapital Income Securities, Inc.*,
    675 F.2d 1041 (9th Cir. 1982) ........................................................................................ 24

## STATUTES AND RULES

*Federal Rules of Civil Procedure*

FRCP  9(b) ................................................................................................................ 26, 28

FRCP 12(b)(6) ........................................................................................... 15, 16, 17

FRCP 23.1 ....................................................................................................................... 7

*Securities Exchange Act of 1934*

§14(a), 15 U.S.C. §78n(a) ..................................................................................... 8, 27, 28

Reform Act, 15 U.S.C. §78u–4(b)(1) and (2) ............................................. 25, 26, 27, 28

Regulation S-K, 17 C.F.R. §229 .................................................................... 17, 23, 24

*Securities and Exchange Commission*

Rule 14a-9, 17 C.F.R. §229.14a-9 ................................................. 1, 3, 5, 14, 21, 23, 25

Schedule 14A, 17 C.F.R. §240.14a-101 .............................................................. *passim*

## MISCELLANEOUS

Brudney : A Note On Materiality and Soft Information Under The Federal Securities Laws,
        75 Va. L. Rev. 723 (1989) ......................................................................... 9, 12

Folk : The Delaware General Corporation Law, ¶157.6 ....................................... 14, 15

**Kozinski and Reinhardt** : Please Don't Cite This! Why Wc Don't Allow ............................... 10
Citation To Unpublished Decisions  Cal.Law. (June 2000)

Loss, I : Securities Regulation,
        (2nd Ed. 1961, Little Brown & Co.) .......................................................... 9, 29

Prosser and Keeton On The Law Of Torts,
        §31 (5th ed. 1984) ........................................................................................ 28

Thomas and Martin, The Determinants of Shareholder Voting On Stock Option Plans
        35 Wake Forest L. Rev., 31, 41 (2000) ..................................................... 19, 21

## STATEMENT OF THE CASE

This is not a securities fraud class action. It is a stockholder's derivative action on behalf of Honeywell International, Inc., a Delaware corporation, ("Honeywell" or the "Company") to recover against its directors for a Proxy Statement that was materially incomplete, inadequate, false, and misleading. The Proxy Statement solicited the stockholders' approval of a stock based compensation plan including stock options, which has caused, and will cause, injury to the Company.

The main point at bar is that the Proxy Statement omitted disclosure of the total number of stock options and other stock based awards that could be granted, which is a disclosure that is expressly required by regulations of the Securities and Exchange Commission ("SEC"). The regulations are in SEC Schedule 14A, 17 C.F.R. §240.14a-101. Specifically, they require disclosure of the number of shares "underlying such options" and other stock based awards. (Schedule 14A (Item 10(b)(2)(i)(A)) and (Item 20)). Sometimes, this is called "the number of options." *Galef v. Alexander*, 615 F.2d 51, 65 (2nd Cir. 1980). At bar, the Company can settle every option by paying cash to the option holder and granting new options on those same shares. There is no limit to the number of options that the Company can grant.

In addition, the Proxy Statement represented that the number of shares available for issuance is 33,888,057, but that this number could be increased by an unspecified amount. This representation was materially false and misleading, in that it misled the stockholders to believe that only 33 million options could be awarded. This 33 million share misrepresentation violated another SEC rule, i.e., Rule 14a-9, 17 C.F.R. §229.14a-9.

The plan will last for ten years and cost the Company fifty to one hundred million dollars annually, but the Proxy Statement omitted to disclose the dollar value or cost of the Plan.

## STATEMENT OF FACTS

Plaintiff filed the original complaint on November 3, 2003 and the amended complaint on February 20, 2004. All references are to the amended complaint, unless the original complaint is expressly cited. Plaintiff is a stockholder of Honeywell. (Cpl. ¶5) The defendants are Honeywell and

its board of directors. (Cpl. ¶6) We refer to all defendants as Honeywell unless the context otherwise requires.

For the 2003 annual meeting of the Company's stockholders, the Company's board of directors solicited proxies to vote to approve the 2003 Stock Incentive Plan of Honeywell International, Inc. and Its Affiliates (the "Plan") by use of the Proxy Statement. (Cpl. ¶10) All the defendants permitted the use of their names in the Proxy Statement. (Cpl. ¶12).

The complaint at ¶15 alleges that "the Proxy Statement nowhere discloses the number of shares ...underlying the grants of stock options" and other stock based awards, or, as some say, "the number of options." Instead, the Proxy Statement addresses "the number of shares available for issuance," and then it recites intricate, incomprehensible rules for counting shares so that the reasonable stockholder cannot know the number of stock options that can be granted. The Company's certificate of incorporation authorizes the issuance of 2,000,000,000 (i.e., two billion) shares of common stock, of which it has issued 855,585,367 shares. (Cpl. ¶9.) It might seem that Honeywell could grant no more than, say 1.44 billion options, but there is no such limit, as the complaint at ¶¶16, 17 alleges.

The complaint alleges that there are financial consequences to the Company when it grants stock options and other stock based awards and when it settles them in cash. Paragraph 18 of the complaint alleges that Honeywell does not account for stock options pursuant to FASB 123, but that "it does prominently disclose the effect, *pro forma*, of such accounting pursuant to FASB 148 ¶2(e)(c)(December 2002)." This means that it measures the value of stock options on the date of grant by means of an option pricing model, e.g., Black-Scholes, or a binomial model. That value is the compensation cost, and it is expensed during the period in which the option vests. That *pro forma* cost is recognized whether or not the option is exercised and whether or not any shares of stock are issued. If the stock option expires unexercised, FASB 123, ¶26, forbids reversal of the expense. This accounting treatment is consistent with the supporting economic science. The complaint at ¶19 further alleges that settlement of stock options in cash results in instant dilution.

- 2 -

The financial consequences to the Company of incurred *pro forma* expense (quantified at Cpl. ¶21) and instant dilution underscore the importance of the requirements of 17 C.F.R. §240.14a-101 (Item 10(b)(2)(i)(A)) and (Item 20), SEC Schedule 14A, to disclose the actual number of options and not some other number that can be increased to an unspecified amount.

The complaint, at ¶17, alleges that the Plan is inexplicable under SEC regulations, and that the solicitation of stockholders to approve it frustrates the purposes of these regulations, i.e., to empower stockholders, in the Company's interest, to impose a limit to prevent runaway grants of stock options.

The complaint at ¶19 alleges that the Proxy Statement did not simply omit disclosures that were positively required by SEC regulations. It went further and made affirmative material misrepresentations, *viz*, that only 33 million shares were available to underlie awards. The reasonable investor understood this language to mean that only 33 million options could be granted. Since the Proxy Statement recited the intricate procedures for counting to 33 million, it might seem impossible that reasonable investors could be so misled, but a proxy statement is unaccompanied by serious legal teams to explain its true meaning and to warn the reader that language must be carefully parsed and that a stockholder, long since having been graduated from kindergarten, must keep his critical wits focused on the difference between shares issued and stock options granted, as they may be affected by cash settlements, withheld employment taxes, open market purchases, and the use of shares to pay for yet other shares when an option is exercised. (See Cpl. ¶16.) For the stockholders confronting the Proxy Statement without lawyers, it is Columbus and the egg. (Cpl. ¶19, Exh. 1.)

The allegations concerning 33 million shares state a claim for violation of Rule 14a-9, 17 C.F.R. §229.14a-9, distinct from and in addition to, the consequences of disclosing no maximum number of options.

Finally, the complaint at ¶21 alleges that the Proxy Statement was materially false and misleading for failing to disclose the cost of the Plan. Honeywell accounts for the *pro forma* cost of stock based compensation pursuant to FASB 123 and 148.

- 3 -

The complaint at ¶22 alleges that "an ordinarily loyal board of directors does not (or should not) adopt a multi-billion dollar project without knowing the cost. Surely, they can measure and disclose the cost of the Plan." The Company annually expenses, *pro forma* between fifty and one hundred million dollars for stock based compensation. (Cpl. ¶21.). Among the first things that the Honeywell board elects to tell this court about themselves is that they are "distinguished." (D.B. 1) It is unthinkable that distinguished board members adopted a plan without any limits on the number of options or the dollar cost.

The plaintiff's attorney, representing other clients, has brought a number of stockholders' derivative actions in state and federal courts challenging the omission of Black-Scholes or other option pricing model values of stock options from proxy statements that solicited stockholder approval of stock option plans. All those other cases held that the omission did not give rise to a claim or a cause of action by the stockholder. (Cpl. ¶23.)

The facts at bar, however, are distinguishable from all those other cases. First, at bar, the Proxy Statement violates Schedule 14A, 17 C.F.R. §240.14a-101, in that it omits to disclose the number of shares underlying options and other stock based awards, but in all those other cases, except one which we address <u>infra</u>, the number of options was disclosed. All but the excepted case held that disclosure of that number of options or shares underlying options was adequate to inform the stockholder. The excepted case did not address the requirements of Schedule 14A. At bar, omission of that number of options is not only material, for it is expressly required by SEC regulations (Schedule 14A), but it makes evaluation of the Plan impossible by even the most extraordinarily gifted financial analyst who can do Black-Scholes calculations in her head.

Second, at bar, the Company accounts for the grant of stock options and other stock based awards under the *pro forma* fair value method of FASB 123 and 148. (Cpl. ¶18.) The Company incurs a *pro forma* expense against income as the awards vest. The amount of the expense is determined as of the date of grant by means of an option pricing model. In all the other cases, none of the companies accounted for stock options in this way. (Cpl. ¶23.) Instead, they used an older

- 4 -

method under which neither the grant of stock options nor exercise of stock options was treated as an expense, and the exercise of stock options was treated on the balance sheet, the cash flow statement, and on the statement of changes in stockholders' equity.

The Company's accounting method for stock based compensation produces annual *pro forma* expenses of fifty to one hundred million dollars based on the Black-Scholes option pricing model. (Cpl. ¶21.) These expenses begin typically within a year after grant, and if an option vests and then expires unexercised, the accounting rules forbid a reversal of that expense. (Cpl. ¶18.) The accounting method of the companies in all the other cases does not provide for an expense against income. (Cpl ¶23.) For the companies in those other cases, the effects on the balance sheet, the statement of cash flow, and the statement of changes in stockholders' equity occur in the future at unpredictable times, if at all, and only if the option holder actually exercises it.

Third, a stock based compensation plan can have a limit on the number of awards, e.g., options, etc., or a limit on the dollar cost. <u>See</u> the Motorola, Inc. 2004 Proxy Statement at page 22, where it will grant the new CEO a stock option having an aggregate Black-Scholes value of $6,250,000, based on the future stock price. (http://www.sec.gov/Archives/edgar/data/68505/000119312504040744/ddcf14a.htm) The Plan at bar, by its terms, has a limit on neither. A good and distinguished board of directors does not authorize projects with unlimited budgets, so it is a reasonable inference that the limits on this plan must exist and have been determined by resolution of the board of directors.

We respectfully submit that these facts call for this court now to distinguish that line of authority. Moreover, none of those cases is binding authority on this court. (Cpl. ¶23.) As we further submit, especially in Point III, C, they were wrongly decided even upon their own facts. Accordingly, we respectfully request this court to deny the motion to dismiss.

## THE MOTION TO DISMISS

The first alleged defect in the Proxy Statement is the omission of the disclosure of the number of shares to underlie stock options and other stock based awards required by SEC Sechedule 14A

(Item 10(b)(2)(i)(A)) and (Item 20), 17 C.F.R. §240.14a-101. The motion to dismiss, however, does not refer to these regulations, and it makes only fleeting reference to the allegations of the complaint that invoke them. It seeks to defend this omission under a totally distinct regulation, i.e., Rule 14a-9, 17 C.F.R. §229.14a-9. Perhaps it means that the movants agree that the Proxy Statement is defective in this regard. We submit that the court can stop here and deny the motion.

Per contra, the complaint alleges no violation of Item 10(a) of Schedule 14A, as distinguished from Item 10(b), but the largest single segment of the memorandum of law is devoted to it. (Defendants' Memorandum at pages 25-31.[1]) We submit that the court should deny a motion to dismiss a claim that the complaint does not allege.

Finally, the motion contains arguments that courts have held that option pricing models are unreliable and do more harm than good. This is a "factual" argument and a hopelessly unscientific one, too. The court should summarily reject it.

## ARGUMENT

### I. "DO NOT MAKE A DEMAND," WARN THE COURTS ABOUT DELAWARE CORPORATIONS

The courts have taught stockholders "not to make a demand" when they are considering bringing a derivative action on behalf of a Delaware corporation, for it substantially changes and weakens the claim. In *RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318, 1328 (2 nd Cir. 1991), the court cited *Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) and held, idem:

> If no demand is made, the derivative action may challenge the underlying transaction, and the complaint will not be dismissed because of the business judgment rule if it has alleged a prima facie breach of a fiduciary obligation. Once a demand is made, however, the challenge under Delaware law must be not to the underlying transaction, but to the board's decision not to bring the lawsuit. ... If reported cases are any indication, few, if any, plaintiffs surmount this obstacle.

---

1.   References to the memorandum of law in support of the moting are given as "DB", followed by the page number.

This court and the Third Circuit agree with these principles as expressed by the Delaware Supreme Court and the Second Circuit. *Blasband v. Rales*, 971 F.2d 1034, 1051 (3rd Cir. 1992); *Coyer v. Hemmer*, 901 F.Supp. 872, 886 (D.N.J. 1995); *Abrams v. Koether*, 1992 WL 295195 at *4 (D.N.J. 1992); *Abrams v. Koether*, 766 F.Supp. 237, 249 (citing, *RCM*), 254 (D.N.J. 1991). Heeding the courts' warnings, the stockholder at bar made no demand upon the Honeywell Board of Directors, relying, in part, upon exceptions under Delaware law.

Notwithstanding the general rule that a Delaware corporation is run by its board of directors, the law of Delaware considers the stockholder's derivative suit a proper remedy for corporate harm "resulting from misconduct by its directors," and to be one of the "potent tools to redress the conduct of a torpid and unfaithful management." *Rales v. Blasband,* 634 A.2d 927, 933 (Del. 1993), quoting *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

For a lawyer to reject the courts' collective wisdom and to advise the stockholder to make a demand could, we submit, mishandle that potent tool, the derivative suit, and constitute malpractice.

## II.    THE COMPLAINT PROPERLY ALLEGES THAT DEMAND IS EXCUSED

In this stockholders' derivative action in federal court, FRCP 23.1 provides the pleading standards for the demand allegations, and state law ordinarily, with exceptions, governs the substance of the requirement to make demand. *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90 (1991); *RCM Securities Fund, Inc. v. Stanton*, supra, 928 F.2d at 1330. The state's law that applies is the state of incorporation. *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. at 108-09; *Abrams v. Koether*, supra, 766 F.Supp. at 249, which at bar is Delaware.

The exception in this area, as in other areas where federal courts apply state law, is that federal courts do not apply state law where it would impair federal policy.  *Kamen v. Kemper Financial Services, Inc.,* supra, 500 U.S. at 98; *Reo v. U.S. Postal Service*, 98 F.3d 73, 76 (3rd Cir. 1996); *RCM Securities Fund, Inc. v. Stanton*, supra, 928 F.2d at 1330.

- 7 -

Recently, in *Vides v. Amelio*, 265 F.Supp.2d 273, 275-76 (S.D.N.Y. 2003), under Delaware law and federal policy, the court held that demand was excused in a stockholder's derivative action where the complaint alleged misstatements and omissions in a proxy statement. The *Vides* court reviewed Delaware law that proper disclosure does not concern the "management of business and affairs" of a corporation and that disclosure is not an issue "inherently of the kind that courts are ill suited to treat on their own," citing *In re Anderson Clayton Sh.Lit.*, 519 A.2d 669, 675 (Del.Ch. 1986). *Vides* also held that false and misleading disclosures are not protected by the business judgment rule, citing *In re Tri-Star Pictures, Inc. Lit.*, 1990 WL 82734 at *8 (Del.Ch. 1990). As the Third Circuit held, in *Blasband v. Rales*, supra (971 F.2d at 1048), the demand "inquiry 'is inextricably bound to issues of business judgment and the standards of that doctrine's applicability.'"

The *Vides* court reviewed federal policy citing *Galef v. Alexander*, 615 F.2d 51, 63-64 (2nd Cir. 1980) and observed that the business judgment rule cannot be invoked by directors who are sued in a stockholder's "derivative action for providing inadequate information in connection with a proxy solicitation." See also *In re Westinghouse Sec.Lit.*, 832 F.Supp. 989, 998 (W.D.Pa. 1993), where the court held it would be a misapplication of the business judgment rule to allow a demand defense to a stockholder's derivative action alleging that the directors had made inadequate disclosures in a proxy statement, and this is the rule "regardless of their independence."

None of the demand cases cited by Honeywell (D.B. 14-18), is applicable, for none of them addresses a false and misleading proxy statement.

Defendants question whether this case is properly brought as a stockholder's derivative action, but they cite no authority. (DB 13, n.3.) They overlook the holding of the Supreme Court in *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559 (1964) that under 15 U.S.C. §78(n)(a) "a right of action exists as to both derivative and direct causes." Delaware law is in accord. *In re Tri-Star Pictures, Inc. Sh.Lit.*, supra, at *7-*9.

- 8 -

**III.    THE PROXY STATEMENT IS MATERIALLY
INCOMPLETE, INADEQUATE, FALSE, AND
MISLEADING, FOR IT OMITS TO DISCLOSE
THE NUMBER OF SHARES UNDERLYING
OPTIONS AND OTHER AWARDS IN THE PLAN,
AND THE COST OF THE PLAN.**

The Supreme Court in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991), held that the principal purpose of a proxy statement "should be to inform, not to challenge the reader's critical wits." It also held that a proxy statement should not make the stockholders into "unwitting agents of self-inflicted damage." 501 U.S. at 1103. In *Shaev v. Saper*, 320 F.3d 373, 379, 382 (3rd Cir. 2003), the Third Circuit applied these rules to a proxy statement seeking stockholder approval of a cash bonus plan of corporate compensation. The court held that the prevention of stockholders' "authorizations for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations. ...is a highly important rule in the corporate life of this nation." 320 F.3d at 379 (citations omitted). It is a rule that should receive emphasis. *No. 84 Employer Teamster Fund v. America West Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003); *Houbigant, Inc. v. Deloitte & Touche, LLP*, 753 N.Y.S.2d 493, 498 (1st Dept. 2003).

This Plan and its presentation in the Proxy Statement are like the company that raised capital "for carrying on an undertaking of great importance, but nobody to know what it is." Loss, I Securities Regulation at p.4 (2nd Ed. 1961, Little Brown & Co.).

The Second and Third Circuits have reconfirmed the rule that a complaint may not be dismissed on materiality grounds unless the misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Shaev v. Saper*, supra, 320 F.3d at 384; *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2nd Cir. 2000); *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2nd Cir. 1999). The disclosures expressly required by 17 C.F.R. §240.14a-101 (Item 10(b)(2)(i)(A) and (Item 20) are "presumably material." *In re Craftmatic Sec.Lit.*, 890 F.2d 628, 641, n.17 (3rd Cir. 1989); Brudney A Note On Materiality and Soft Information Under The Federal Securities Laws, 75 Va.L.Rev. 723, 727 (1989).

- 9 -

Honeywell asks this court to follow the Second and Ninth Circuits in holding that a proxy statement need not disclose the Black-Scholes cost of proposed stock options (DB 27, 29). However, we seek to distinguish the Second Circuit on the 17 C.F.R. §240.14a-101 Item 10(b)(2)(i)(A) and Item 20 point, not cited by the Second and Ninth Circuits, and the point that the Second and Ninth Circuit cases stated the number of shares underlying the option. Also the Second and Ninth Circuits did not address companies that treated stock options as a pro forma expense against income. These are points that the Second Circuit "never has addressed directly," and this court "is not constrained to follow it." *Korwek v. Hunt*, 827 F.2d 874, 877 (2d Cir. 1987).

Honeywell cites the summary order in *Shaev v. Hampel*, 2003 WL 22139567 (2nd Cir. 2003) in support of its motion to dismiss the complaint. In *Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001), the court held, "Designating an opinion as binding circuit authority is a weighty decision that cannot be taken lightly, because its effects are not easily reversed. ...[noting] 'unwieldy' and time consuming en banc procedures. [citation omitted]." 266 F.3d at 1172. The court held that "one important aspect of the judicial function is separating the cases that should be precedent from those that should not." 266 F.3d at 1180. In the latter category are cases with "no discoverable *ratio decidendi*. ...and those which judges themselves do not think worthy of being precedents." 266 F.3d at 1180, n.40. In some cases the decision may not "recite all facts," (266 F.3d at 1176), so that "the disposition is not written in a way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not announced in a way that makes it suitable for governing future cases." 266 F.3d at 1178. The problem, held the court, is that "zealous counsel would be tempted to seize upon superficial similarities between their clients' cases and unpublished dispositions." 266 F.3d at 1178. This is what has happened at bar. See also, **Kozinski and Reinhardt**, "Please Don't Cite This! Why We Don't Allow Citation To Unpublished Decisions," Cal.Law. (June 2000) (http://www.dailyjournal.com).

- 10 -

The Second Circuit summary order does not reveal, for example, that the complaint did not allege a violation of 17 C.F.R. §240.14a-101 (Item 10(a)) or (Item 10(b)). The summary order does not even cite the regulation.

A.    **The Proxy Statement Must**
      **Disclose The Number Of Options**

      1.    The Omission from the Proxy Statement Of The
            Number of Shares Underlying Options And
            Other Awards Violates the Express Requirement Of
            SEC Regulations and Renders It Materially Deficient

We submit that when stockholders are asked to approve a stock option plan, SEC regulations expressly require that the proxy statement disclose the number of shares underlying options contained in the plan. These detailed regulations were described in *Galef v. Alexander*, 615 F.2d 51, 65 (2nd Cir. 1980). The Second Circuit specifically observed that "remuneration . . . is indeed the subject of special regulations under §14(a)." The Second Circuit had previously made the same observation in *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979).

As the complaint alleges in ¶14, the applicable "special regulations" are Item 10(b)(2)(i)(A) and Item 20 of SEC Schedule 14A, 17 C.F.R. § 240.14a-101, the Schedule cited in *Galef v. Alexander, supra*, 615 F.2d at 55 n.10, and in *Maldonado v. Flynn, supra*, 597 F.2d at 796. Schedule 14A begins with the language, "Information required in proxy statements." Item 10(b)(2)(i) expressly requires, "With respect to . . . any plan containing options . . . submitted for security holder action, state (A) the title and amount of securities underlying such options. . . ." Item 20 is entitled, "Other proposed action," and in relevant part it requires:

> If action is to be taken on any matter not specifically referred to in this Schedule 14A,
> describe briefly the substance of each such matter in substantially the same degree of
> detail as is required by Items 5 to 19, inclusive, of this Schedule.

No other provision of Schedule 14A addresses requirements for proposed plans containing SARs, performance awards, growth plan units, restricted units, restricted stock, and other stock based awards, which are authorized by the Plan. (Cpl. ¶11.) We submit that Item 20 requires the proxy

- 11 -

statement to disclose the number of shares underlying awards other than stock options as if they were addressed in Item 10(b)(2)(i)(A). Representing a low number that serves as a floor, rather than a ceiling, is in violation of this Item.

As the complaint (at ¶17) alleges, this frustrates the purpose of the SEC regulations, for the Company can now be forced to issue far more options than the stockholders authorized. The SEC's requirement that this number be disclosed without regard to its determinability, Cpl. ¶17, underscores its importance. The SEC, we submit, is the authority on what information is material to the stockholder and how a proxy statement is required to present it. *Brudney,* supra; see *Resnik v. Swartz,* 303 F.3d 147, 154-55 (2nd Cir. 2002).

Since the Company now measures the cost to grant stock options as a *pro forma* expense against income, we submit that the Proxy Statement is required to report the number of underlying shares for options and other awards in conformity with Item 10(b)(2)(i)(A) and (Item 20), for that is what determines the cost to Honeywell, and it concerns the reasonable stockholder, at the annual rate of 50 to 100 million dollars.

Previously, Generally Accepted Accounting Principles ("GAAP") did not require that corporations expense the value of stock options against earnings. Instead, when an option was exercised and stock issued, the transactions were recorded in the statements of cash flows and changes in stockholders' equity and reflected in the balance sheet, but not in the statement of earnings, and this was done only when the stock option was exercised. If it was not exercised, none of these entries was made. (Cpl. ¶¶18, 23.)

These days, and since FASB 148 (December 2002), which was promulgated after *Resnik v. Swartz,* supra, following new GAAP, Honeywell recognizes and prominently reports *pro forma* expenses against earnings of the costs of the stock options that it grants. (Cpl. ¶18) As the complaint, at ¶21, alleges, this costs the Company between 50 and 100 million dollars each year, and these costs are incurred whether or not the option is ever exercised and the stock is ever issued. (Cpl. ¶18.)

- 12 -

The Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 123 (1995)("FASB 123") at ¶26 provides, "Previously recognized compensation cost shall not be reversed if a vested employee stock option expires unexercised." (Cpl. ¶18.) Further, FASB 123 at ¶166 explains that such a reversal "would be inconsistent with the nature of an employee stock option (an equity instrument of the employer) and with both grant date and vesting date accounting. . . . Moreover, to be internally consistent, recognizing income when an option expires out-of-the-money would call for recognizing additional compensation cost when the stock price increases as well – the result would be exercise date accounting." (Gruppuso Cert. ¶5, Exh. C.)

The complaint, at ¶18, alleges that FASB 123 is consistent with the supporting economic science. Neil A. Chriss in his book Black-Scholes And Beyond: Option Pricing Models, 128-29 (Irwin 1997) states that the fair value of a stock option at its date of grant is the cost required for the grantor of the option to meet the obligation, i.e., a hedge. Specifically, he says that if the option expires in the money, the hedge will be worth the difference between the market price of the stock and the exercise price of the option. He further explains, "If the option expires out of the money, the hedge will be worth nothing." (Cpl. ¶18.)

The change in the accounting rules underscores the importance of strict compliance with the SEC's Schedule 14A, 17 C.F.R. § 240.14a-101.

Honeywell mistakenly relies on Shaev v. Hampel, 2002 WL 31413805 (S.D.N.Y. 2002) aff'd by summary order, 2003 WL 22139567 (2nd Cir. 2003), but neither the district court, nor the appellate court addressed 17 C.F.R. §240.14a-101 (Item 10(b)(2)(i)(A)) or (Item 20).

The omission from the Proxy Statement of the Item 10(b)(2)(i)(A) and (Item 20) disclosure alone renders it materially deficient, Shaev v. Saper, supra, 320 F.3d at 383 n.7, 384 (violations of 17 C.F.R. § 240.14a-101); Prudent Real Estate Trust v. Johncamp Realty, Inc., 599 F.2d 1140 (2nd Cir.1979), and it is, we submit, sufficient reason to deny the motion to dismiss.

- 13 -

2.   The Proxy Statement is Materially False and Misleading
     Concerning the Number of Shares.

The complaint alleges more than a violation of Schedule 14A, 17 C.F.R. §240.14a-101. Disclosing no number of available shares would be sufficient for that violation. Dangling the 33 million share number is materially false and misleading, in violation of yet another SEC regulation, i.e., Rule 14a-9, 17 C.F.R. §229.14a-9.

The complaint at ¶16 alleges that the Proxy Statement represents that 33 million shares are available for issuance under the Plan, but that the Plan does not limit the number of stock options and other stock based awards that can be granted, not even by the two billion shares authorized by the certificate of incorporation. *Folk on the Delaware General Corporation Law*, ¶157.6 (4th ed. 2002-2 *supp.*). Moreover, at ¶19 the complaint alleges, "The reasonable investor, reading the Proxy Statement, understood that only approximately 33 million shares were available to underlie awards under the Plan. ...For the stockholders, it was like Columbus and the egg. (See Exhibit 1 hereto)."

The district court in *Galef v. Alexander*, 1979 U.S. Dist. LEXIS 14856, at *9, observed that there was a question of fact as to whether "such language would be interpreted by a shareholder to mean the number of shares that were authorized for grant [underscoring added]," i.e., the maximum number of options, but it did not resolve the dispute. Honeywell does not cite *Galef v. Alexander*.

Instead, Honeywell relies on *Shaev v. Hampel*, 2002 WL 31413805 (S.D.N.Y. 2002) ("*Alcoa*"). We submit that *Alcoa* is unsound and that this Court should not follow it. When the Second Circuit affirmed, it did so by a non-precedential summary order, 2003 WL 22139567, which, we submit, invites all courts to revisit the point.

The *Alcoa* court erred in holding at *8 that it was sufficient for the Proxy Statement to disclose that "additional shares could become available", without reporting an actual number of shares. Such a statement is unquantified and useless. Under the Plan there is no limit on the number of awards.

- 14 -

An insubstantial difference in numbers might suggest imateriality, *In re Westinghouse Sec. Lit.*, 90 F.3d 606, 714-15 (3rd Cir. 1996), except where the regulations require disclosure. *Shaev v. Saper*, supra, 320 F.3d at 384; *In re Craftmatic Sec.Lit.*, supra, 890 F.2d at 641, n.17. But, in *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162-64 (2nd Cir. 2000), the court held that a substantial difference between the reported number and the actual number could indicate a material misstatement. In *Gediman v. Anheuser Busch, Inc.*, 299 F.2d 537, 545 (1962), it held that a statement that retirement benefits, based on certain elections "would not be as much as" $79,690, was materially misleading when the actual benefit was $32,780.44, i.e., 42% as much. In *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 436 (2nd Cir. 1943), it held that purchasers of securities were misled when they paid "16.1 to 40.9 percent over market value." Although these cases do not address proxy statements or numbers of shares, we submit that their numerical logic is applicable, especially since, at bar, there is no limit to the substantiality of the potential increase in the number of awards beyond 33 million. *Folk*, supra.

The *Alcoa* court committed additional error in holding:

> Plaintiff also fails to allege facts to substantiate the charge that additional "reasonable estimates" would be anything more than speculation. At *8.

We submit that it was error, on a FRCP 12(b)(6) motion, to accredit defendants' unsworn assertion in a brief that there were no reasonable estimates, and that it would be only speculation. *In re Warfarin Sodium Antitrust Lit.*, 214 F.3d 395, 397-98 (3rd Cir. 2000). In *Galef v. Alexander*, supra, 615 F.2d at 63, we find:

> Those managing the corporation have the greatest access to relevant factual information. They have most clearly in mind the corporation's long-range plans.

This is not "speculation," as the *Alcoa* court said of that board. It was additional error for the Alcoa court to require a plaintiff on a FRCP 12(b)(6) motion to present facts to refute defendants' charge of speculation. *Koppel v. 4987*, supra, 167 F.3d at 133. We submit that it is a reasonable inference that Honeywell and its distinguished board of directors planned in advance.

- 15 -

Moreover, the *Alcoa* court misplaced its reliance on the cases it cited, at *8. *Krauth v. Executive Telecard, Ltd.*, 890 F.Supp. 269 (S.D.N.Y. 1995) was a decision after trial, and the "prediction" was addressed to the conduct of another, i.e., the NASD. At bar, we are still at the pleading stage, and the "prediction" concerns the plans of the same people who solicited the proxies. *Kahn v. Wein*, 842 F.Supp. 667, 671 (S.D.N.Y. 1994) was rendered after discovery. The omitted facts were self-evident, and considerable financial detail was provided (Id. at 675), unlike the case at bar. *Freedman v. Barrow*, 427 F.Supp. 1129, 1144 (S.D.N.Y. 1976) addressed the preferences of employees instead of the solicitors of proxies.

Finally, the *Alcoa* court, supra, 2002 WL 31413805 at *8, held that the 14 million share number was not misleading because "[n]o reasonable shareholder ... would have believed" that 14 million was the total number. We submit that this was error, for on an FRCP 12(b)(6) motion, the proxy statement must be construed in "the light most favorable" to plaintiff. *Koppel v. 4987 Corp.*, 167 F.3d at 133. The Third Circuit has held, "Rule 12(b)(6) instructs that the District Court draw inferences in favor of plaintiffs, not the proponent of the motion." *In re Warfarin Sodium Antitrust Lit.*, supra, 214 F.3d at 398. We submit that the issue is not what the court can discern. Rather, it is what the reasonable stockholder did perceive. *Shaev v. Saper*, supra, 320 F.3d at 381, (not a "model of clarity"). For the stockholder, without a team of four excellent law firms to explain it, we suggest it is like Columbus and the egg. (Cpl. ¶19, Exh. 1.) The complaint, at ¶19, makes a declarative factual allegation, which we are confident we can prove after discovery, that 33 million shares underlying options was the maximum available and the district court in *Galef v. Alexander*, supra, held that a reasonable stockholder might well have believed it..

Honeywell argues that this is a conclusory allegation "couched in the guise of a fact pleading," citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3rd Cir. 1993) (DB 22), but this argument is wrong. *Papasan v. Allain*, 479 U.S. 265, 285-86, 106 S.Ct. 2932 (1986) (allegation that State deprived children of "minimally adequate education" is conclusory when based solely on "funding disparities"). Instead, this is an allegation of historic fact that provides "direct evidence" of

materiality. See *Swierkiewicz v. Sorema N.A.*, 534 U.S 506, 511-12, 122 S.Ct. 992 (2002). It may seem strange, maybe even impossible, that reasonable investors were misled, but then truth is stranger than fiction. *Denton v. Hernandez*, 504 U.S. 25, 32-33, 112 S.Ct. 1728 (1992). What Honeywell is really saying is that the court should not believe the allegation, but that is not a basis to dismiss under F.R.C.P. 12(b)(6), *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827 (1989), as this court has consistently held. *South Camden Citizens in Action v. New Jersey D.E.P.*, 254 F.Supp.2d 486, 493 (D.N.J. 2003); *A.W. v. Jersey City Public Schools*, 2002 WL 1065685 at *3 (D.N.J. 2002), aff'd,. 341 F.3d 234 (3rd Cir. 2003).

Finally, the *Alcoa* court's statements concerning reasonable understanding and speculative prediction as to the number of shares have no bearing on the disclosure duty under Item 10(b)(2)(i)(A). See Point III, 1., supra. That was a point that in *Alcoa* did not consider, nor did the Second Circuit.

> 3.     Even Without Regard to Express Rules
>         Requiring Disclosure, Courts Have
>         Treated the Number of Shares
>         Underlying Options as Material.

Unfailingly, even without the application of Items 10(b) and 20 of Schedule 14A, 17 C.F.R. §240.14a-101, the courts have treated the total number of available option shares to be material when proxy statements seek stockholder approval of a plan. We are unaware of any case to the contrary. In the cases brought by plaintiff's counsel one of the principal reasons for rejecting the argument to require disclosure of the Black-Scholes cost of the stock option has been that the proxy statements disclosed the total number of shares underlying options. For example, in *Resnik v. Swartz*, 303 F.3d 147, 152 and 153 (2nd Cir. 2002), the court emphasized the 50,000 shares underlying the options:

> Pursuant to this subsection [17 C.F.R. §229.402(g)], all that is required is disclosure of the arrangements for and amounts of directors' compensation. The description of the directors' standard fees and the options proposed to be awarded, as disclosed in the proxy statement and its Annex, plainly meets this basic requirement.
>
> Appellant does not contend that this statement is inaccurate as to fees paid to Symbol's non-employee directors. Nor can this statement convey the impression that non-employee directors' compensation was limited to these fees, as the same section

- 17 -

> of the proxy statement also contains a description of the proposed Plan and its terms. Thus, the proxy statement makes it clear that each non-employee director's compensation also would include an option to purchase 50,000 shares of Symbol's common stock on the terms both summarized in the proxy statement and fully stated in the Annex. The failure to place an estimated present value on these options does not render the disclosure of director compensation misleading.

Similarly, the district court, in *Resnik v. Swartz*, 2001 WL 15671 (S.D.N.Y. 2001), also held that the disclosure of the amount of shares subject to options was sufficient.

*Seinfeld v. Bartz*, 2002 WL 243597 at *1 (N.D. Cal. 2002) aff'd., 322 F.3d 693, 695, 698 (9th Cir. 2003), *certiorari denied,* _____U.S._____, 124 S.Ct. 132 (2003), also relied upon the proxy statement disclosure of the number of shares as sufficient compliance "with SEC regulation disclosure standards," (Id. 322 F.3d at 698), making option pricing models unnecessary. *In re 3Com Corp. Shareholders Lit.*, 1999 WL 1009210 (Del.Ch. 1999) held, "basic details concerning the value of options would be material to a reasonable shareholder's decision whether to vote for or against an expansion of the share pool available under the Plan." (Id. at *5.) However, it held that a Black-Scholes disclosure was "neither sufficiently necessary nor reliable" for a proposal that only "raise[s] the ceiling on the number of options," (Id. at *6) "by 1 million (from 2 million to 3 million total shares)." Id. at *1.

In *Cohen v. Calloway*, 667 N.Y.S.2d 249 (1st Dept. 1998) the New York State Appellate Division affirmed the IAS Part without reference to the careful attention it gave to the fact that the "`total mix' of information provided to GE's shareholders included" the number of shares underlying each option, i.e., 3,000, and also the number of shares "subject to the Plan," i.e., 350,000. (See Cpl. ¶23, Exhibit 2, at p. 6.) The reference to "adjustments" in the IAS Part Opinion means the changes that are made to options following stock splits, etc., similar to anti-dilution provisions. *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.) cert. denied, 454 U.S. 965 (1981); *Shaev v. Claflin*, 2001 WL 548567 (N.D. Cal 2001); *Reiss v. Financial Performance Corp.*, 738 N.Y.S.2d 658 (N.Y. 2001). Accordingly, adjustments are not an issue at bar.

- 18 -

And in the first case to address the Black-Scholes issue, *Lewis v. Vogelstein*, 699 A.2d 327, 329-30 (Del.Ch. 1997), the court reviewed the allegations concerning the number of shares for each option as provided in the plan and held that disclosure of option values was unnecessary "under a plan of the type described in the complaint." Id. at 329.  See http://www.sec.gov/Archives/edgar/ data/63276/00008989430-96-000876.txt.

**B.      At Bar, The Proxy Statement Must Disclose**
**The Cost Of The Plan, Even If Courts Were**
**Were Correct In Holding That, As A**
**General Rule, There Is No Such Requirement**

We have quoted from *Resnik v. Swartz*, supra, where the Second Circuit held that disclosing that each director of Symbol Technologies was to receive an option on 50,000 shares of Symbol common stock on specified terms, along with fees of $15,000 per year and $2,500 per meeting attended was not materially misleading.  See 303 F.3d at 149 and 153.  This court held, even though each 50,000 share option had an undisclosed grant date Black-Scholes value of $2,868,000. See 303 F.3d at 150.  The court then held, 303 F.3d at 154:

> Thus, we cannot agree with appellant's interpretation of the challenged statement as suggesting that the Plan options have no value until they are actually exercised. Indeed, a reasonable shareholder would understand that stock options at the time of their grant have value, notwithstanding the uncertainty, until exercise date, of the actual value the option holder will eventually realize.
>
> Accordingly, we reject appellant's argument that the challenged statement makes non-employee directors' compensation appear less than it actually was. As discussed above, the proxy statement makes clear that the non-employee directors' compensation would include the options proposed to be granted under the Plan and fully discloses the Plan terms.

Perhaps the Second Circuit believed that the market understood the Black-Scholes (and other option pricing models) grant date values of stock options, even if it is not "intuitive." Thomas and Martin, "The Determinants of Shareholder Voting On Stock Option Plans, "35 Wake Forest L. Rev., 31, 41 (2000).  (In *Resnik v. Swartz*, supra, 303 F.3d at 150 n. 1, the Second Circuit stated that the parties' arguments were addressed to the Black-Scholes option  pricing model, but that its reasoning was

- 19 -

applicable to "any grant date valuation method." We agree.)  By now, no doubt, four years after the
Wake Forest article, it might well be intuitive for many people who own stock.

However, if the stockholder does not know the number of shares underlying options, his
intuition is worthless.  So, what this Court now confronts is whether *Resnik* applies when that
number of underlying shares is omitted from a proxy statement.

As far as we are aware, no court has answered the question whether a proxy statement can
omit both the number of shares underlying options and the cost of a plan.  In *Shaev v. Hampel*, supra,
at *4-*5, the district court did not.  Instead, it quoted the district court in *Seinfeld v. Bartz*, 2002 WL
243597 at *3 (N.D. Cal. 2002), "Courts in all . . . of these cases held that Black-Scholes valuations
are not material as a matter of law."  Of course, the reasoning of the earlier cases holding that
disclosure of Black-Scholes values was not material, was that the model does not work on
compensatory stock options. *Resnik v. Swartz*, 2001 WL 15671 at *1 (S.D.N.Y. 2001) (Black-
Scholes value of a stock option "can only be described as a best guess"); In Re *3Com Corp.
Sh.Lit.,* 1999 WL 1009210 (Del. Ch. 1999) (as to Black-Scholes, we have consistently taken a rather
jaundiced view of the valuations and their reliability," at *4 n.17, "the Black-Scholes Option Pricing
Model is neither sufficiently reliable nor necessary to apprise shareholders of the value of the options
in question," at *6); *Cohen v. Calloway*, 246 A.D.2d 473, 667 N.Y.S.2d 249 (1st Dept. 1998) (it is
"so imprecise that its inclusion probably would have done more harm than good").  This is a
supposition thoroughly rejected by, inter alia, General Electric, the Company in that case, (Cpl. ¶23).
The Second Circuit in *Resnik v. Swartz*, supra, did not accept this "demonstrably false" assumption
of fact. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 497 (1951) ("This Court has refused to
accept assumptions of fact that are demonstrably false," no matter who agrees with them.) At DB 29,
it recites, "as Plaintiff himself concedes, Am.Compl. ¶23,  in *Cohen*, the company did follow FASB
123." This statement overlooks the fact the court's "so imprecise" remark was made in 1998, and it
was not until 2002 that General Electric began to do "more harm than good."

- 20 -

SEC regulations contemplate disclosing option pricing model valuations in proxy statements. The court in *Resnik v. Swartz* (303 F.3d at 152) did not address whether Item 10(a) of  17 C.F.R. §240.14a-101  contemplates application of an option pricing model, but only whether Item 8 did. It sought to "look to the text of the Item [8] as a whole," but it should have also looked to Item 10(a) of Schedule 14A,  17 C.F.R. §240.14a-101, concerning stockholder voting on new compensation plans for, inter alia, directors. It requires that the proxy statement disclose the "Dollar value" of directors "noncash compensation" if determinable. Item 10(a) expressly addresses the requirements for obtaining stockholder approval of new compensation plans, and it expressly contains the requirement to state the "Dollar value" of non-cash benefits of the proposed new plan. Item 10(a) applies to directors and is not limited solely to officers, and the calculation can only be made with an option pricing model. (Cpl. ¶24; FASB 123; *Thomas and Martin*, supra).

When the Second Circuit affirmed *Shaev v. Hampel,* 2003 WL 22129567 (2d Cir. Sept. 17, 2003), it did not address the question of whether a proxy statement could omit both the number of shares and the cost, and its affirmance was by a non-precedential summary order which, by its terms, cannot be cited at bar. We submit that if the Second Circuit meant to preclude this question, it would not have entered a bare bones summary order.

Neither the Second Circuit nor any other court has held that omission of the cost of a plan is immaterial where the company expenses (even only *pro forma*) those costs against income.  *(Cpl. ¶23.) Resnik v. Swartz*, supra, 303 F.3d at 154, held that "stock options at the time of their grant have value, notwithstanding the uncertainty, until exercise date, of the actual value of the option holder will eventually realize."  We submit that this rationale is inapplicable where the company granting the stock option recognizes a *pro forma* expense against earnings that is measured on the grant date. There all uncertainty vanishes, for the *pro forma* expense will be booked, and the events on the future exercise date, if any, are immaterial.  What the stockholder must know is the amount of that cost. *Galef v. Alexander*, supra.

- 21 -

Honeywell contends that the cases hold that FASB 123 does not require Black-Scholes disclosures in a proxy statement, DB 27-29, and so they do. However, Honeywell misstates the point. As we have shown, it is not whether FASB 123 requires it but whether Rule 14a-9, 17 C.F.R. § 240.14a-9, now requires it for companies that incur a *pro forma* expense against income under FASB 123.

Honeywell argues that Black-Scholes costs were impossible to disclose because future share prices were unknown. Honeywell relies on the so-called Manual of Publicly Available Telephone Interpretations, (http://www.sec.gov/interps/telephone/1997manual.txt), which they claim was published by the SEC's Division of Corporate Finance (DB 30), but this is an overstatement. The first page of the excerpt, at Gruppuso Cert. ¶7, Exh. E, of the 217-page document states:

> The responses discussed in this manual do not necessarily reflect the views and policies of the Commission or the Division of Corporation Finance. Further, they do not nessarily contain a discussion of all material considerations necessary to reach the conclusions stated. Accordingly, these responses are intended as general guidance and should not be relied on as definitive. There can be no assurance that the information in this manual is current, as the positions expressed may change without notice.

This was in 1997, and apparently the statements cited by Honeywell have not been reexamined since then. Moreover, to the extent that the staff seeks to reduce investor protection of Schedule 14A, 17 C.F.R. §240.14a-101, the court should suppress this mutiny.

FASB 123, at ¶373, reports that Black-Scholes and other option pricing model values of stock options are widely used to design compensation packages. (Cpl. ¶22.) Under *In re Warfarin Sodium Antitrust Lit., supra,* 214 F.3d at 398, and *Koppel v. 4987 Corp.*, supra, 167 F.3d at 130, it is also a reasonable inference based on Cpl. ¶22 that the Honeywell board had decided upon a dollar cost of the Plan if they had no limit on the number of options, as the Motorola board did, supra. We submit that insiders get a prior view of the value of the stock options, and the stockholders, who are solicited to approve them and who must indirectly pay the cost of that value, should too.

- 22 -

**C.   This Court Should Decline
To Follow The Second And Ninth
Circuits' Holdings That A Proxy
Statement Can Omit The Cost Of
A Stock Option Plan**

The Ninth Circuit's decision in *Seinfeld v. Bartz*, supra, and the Second Circuit's decision in *Resnik v. Swartz,* supra, are not binding authorities upon this court. We respectfully submit that this court should not follow those cases, for they were wrongly decided. They conflict with the Third Circuit's principles, most recently expressed in *Shaev v. Saper*, supra, to protect the stockholders' vote through vigorous enforcement of the full disclosure requirements of §14(a), 15 U.S.C. §78n(a) and the SEC's rules and regulations.

Those courts both took the approach that disclosure of the cost of stock options was not required by means of Black-Scholes, or any other option pricing model, on the grounds that it was not affirmatively required by SEC regulations. They also felt that it was not required to make the proxy statement not misleading, on the grounds that, "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d at 154; *Seinfeld v. Bartz*, 322 F.3d at 697. ("We agree with the Second Circuit.")

The Second and Ninth Circuits addressed the SEC regulations, starting with 17 C.F.R. §240.14a-101 (Item 8) which refers to 17 C.F.R. §229.402(c) and (g), also known is Regulation S-K. They noted that Item 402(c) expressly provides for Black-Scholes disclosures in proxy statements, but only for executive officers and not directors. On the other hand, Item 402(g), concerns proxy statement disclosure of directors' compensation, but omits references to Black-Scholes evaluations. The courts considered this to be a strong indication that the SEC did not require Black-Scholes disclosures for directors' stock options. We respectfully submit that this is an excessively narrow way to interpret the regulation.

Those courts narrowly overlooked 17 C.F.R. §240.14a-101 (Item 10(a)),  concerning stockholder voting on new compensation plans for, inter alia, directors. It requires that the proxy statement disclose the "Dollar value," of directors' "noncash compensation" if determinable. Item

- 23 -

10(a) expressly addresses the requirements for obtaining stockholder approval of new compensation plans, and it expressly contains the requirement to state the "Dollar value" of non-cash benefits of the proposed new plan. Item 10(a) applies to directors, and is not limited solely to officers.

The Second and Ninth Circuits were too narrow in applying the principle *inclusio unius est exclusio alterius*, for §§402(c) and (g) of 17 C.F.R. §229, without considering Item 10(a) of 17 C.F.R. §240.14a-101, nor where the result seems "to conflict with the objective of the statute it implements," *Sec. of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990), i.e., the protection of investors. 17 C.F.R. §240.14a-9, 27a; see *Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041, 1044 (9th Cir. 1982); *Maldonado v. Flynn*, 597 F.2d 789, 796, n.9 and accompanying text (2nd Cir. 1979). In *Shook v. D.C. Financial Responsibility & Mgmt. Asst. Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998) the court suggested its use "as a starting point in statutory construction — not as a close-out bid." See also *Cheney R. Co. v. ICC*, 902 F.2d 66, 68-69 (D.C. Cir. 1990).

As to the need for Black-Scholes disclosures to make the proxy statements not misleading, the Second Circuit overlooked the principle that the requirements of Schedule 14A, 17 C.F.R. §240.14a-101 are merely minimum requirements and that meeting the minimum does not necessarily guarantee that a proxy statement satisfies Rule 14a-9, 17 C.F.R. §229.14a-9. The Ninth Circuit substantially retreated from this principle. *Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041, 1044 (9th Cir. 1979); *Maldonado v. Flynn*, 597, 789, 796 n.9 (2nd Cir. 1979). The "minimum requirements" principle has been accepted in this court. *International Apparel Associates v. Electronic Associates, Inc.*, 1988 WL 150966 at *5 (D.N.J. 1988).

FASB 123, at ¶373, reports that Black-Scholes values of stock options are widely used to design compensation packages. As the result of the lower court's decision, although insiders get a prior view of the value of the stock options, the stockholders, who are solicited to approve them and who must indirectly pay the cost of that value, do not.

- 24 -

The purpose of the SEC proxy statement rules and regulations are to inform the stockholders so that they can "vote prudently." *Galef v. Alexander*, 615 F.2d 51, 63 (2nd Cir. 1980); *International Apparel Associates v. Electronic Associates, Inc.*, <u>supra</u>, at *6. The regulations have become exceedingly intricate over the years, for the SEC has tried to combine a system of uniform and consistent presentation with full and fair disclosure. These complicated regulations are not a game to be played for its own sake, the point being to beat the system, <u>i.e.</u>, to disclose the facts, but to delete the truth. We submit that the time is over for corporate games. *No. 84 Employer Teamster Fund v. America West Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003); *Houbigant, Inc. v. Deloitte & Touche, LLP*, 753 N.Y.S.2d 493, 498 (1st Dept. 2003); SEC Commissioner Cynthia A. Glassman, <u>Speech : Improving Corporate Disclosure — Improving Shareholder Value</u>, April 10, 2003 (http://www.sec.gov/news/ speech/spch041003cag.htm) at page 3 of 9, said:

> GAAP's complex of rules creates situations where lawyers and accountants may play games with the rules, rather than focusing on the principles underlying them. The more specific the rules, the easier companies may find it to structure transactions specifically to circumvent them. This, of course, if the problem with "bright line" rules: the impulse is to make sure the line isn't crossed instead of making sure the books reflect the true economic condition of the company.

What Commissioner Glassman said of the rules of Generally Accepted Accounting Principles could as easily be said of the rules and regulations of the Securities and Exchange Commission.

## IV. THE COMPLAINT COMPLIES WITH THE PLEADING STANDARDS

The title of Point II of the Honeywell memorandum of law refers to the heightened pleading standards of The Reform Act. <u>See also</u>, DB 7. These standards are codified at 15 U.S.C. §78u-4(b)(1) and (2), as follows:

### (b) Requirements for securities fraud actions

### (1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

- 25 -

(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

### (2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with required state of mind.

Honeywell expressly seeks relief under (b)(1) of 15 U.S.C. §78u-4. It makes no mention of (b)(2), but it does cite FRCP 9(b), which requires particularity in alleging the circumstances of fraud.

This is not a securities fraud class action, and it contains none of the abuses that Congress sought to remedy in passing the Reform Act. It does not arise from a sudden drop in the stock price. It does not target deep pocket defendants. The proposed discovery is very limited, and its cost cannot coerce or extort a settlement. *EP Medsystems, Inc. v. Ecocath, Inc.,* 235 F.3d 865, 871, 872, 881-82, 884-85 (3rd Cir. 2000); *Tobias Holdings, Inc. v. Bank United Corp.*, 177 F.Supp.2d 162 (S.D.N.Y. 2001). This case "does not fall into the pattern of the usual securities action and . . . application of certain legal requirements must be adjusted to fit the particular action." *EP Medsystems,* 235 F.3d at 885.

We respectfully submit that the Reform Act pleading standards do not apply to the Item 10(b) and Item 20 claims under Sechedule 14A, 17 C.F.R. §240.14a-101, nor docs FRCP 9(b). The (b)(1) Reform Act standards do apply to (A) untrue statements and (B) omitted facts that are necessary to make other statements not misleading. As the Third Circuit held, these 15 U.S.C. §78u-4(b)(1)(A) and (B) claims are claims under Rule 14a-9, 17 C.F.R. §229.14a-9, *Gould v. American-Hawaiian*

*S.S. Co.*, 535 F.2d 761, 775 (3rd Cir. 1976), not claims under Items 10(b) and 20 under Schedule 14A which impose an affirmative, absolute duty of disclosure, regardless of whether the omission renders any other statement misleading. *In re Craftmatic Sec.Lit.*, supra, 890 F.2d at 641 n.17; *Brudney*, supra, 75 Va.L.Rev. at 727. That is, breach of a disclosure duty under Schedule 14A occurs without relevance to whether the proxy statement is thereby made misleading.

Assuming that 15 U.S.C. §78u-4(b)(1), cited by Honeywell, does apply to the claims under Rule 14a-9, despite *EP Medsystems, Inc. v. Ecocath, Inc.*, supra, the complaint specifically identifies the misrepresentations and omissions, and it alleges why they are false. It alleges why the 33 million share representation is false. It alleges the Company's use of FASB 123 and 148 and the financial consequences to its income statement. The complaint also alleges that the Company and the directors knew or should have known that the Proxy Statement omitted to disclose the number of available option shares and the cost of the Plan. *Richland v. Crandall,* 262 F.Supp. 538, 553 n.12 (S.D.N.Y. 1967). If they had simply read it they would have known that. Honeywell misplaces reliance on the Not Precedential *In re U.S. West, Inc. Sec.Lit.* 2003 WL 21246539 (3rd Cir. 2003) (allegations of secret intention not supported by record) and *In re NAHC, Inc. Sec.Lit.*, 306 F.3d 1314 (3rd Cir. 2002) (allegations of misrepresentations based on subsequent events), for the complaint at bar contains none of the defects described in those cases.

We also submit that the (b)(2) Reform Act standards, concerning state of mind, are inapplicable to the Schedule 14A Items 10(b) and 20 claims or, indeed, any of the Rule 14a-9 claims at bar.

A claim under 15 U.S.C. §78n(a) and Rule 14a-9, 17 C.F.R. §229.14a-9, is governed by a negligence standard, not a fraud standard. *Herskowitz v. Nutri-System, Inc.*, 857 F.2d 179, 189-90 (3rd Cir. 1988), cert. denied, 489 U.S. 1054, 489 U.S. 1060 (1989); *Gould v. American-Hawaiian S.S. Co.*, 351 F.Supp. 853, 858-65 (D.Del. 1972), affd., 535 F.2d 761 (3rd Cir. 1976); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298-1301 (2nd Cir. 1973); *Wilson v. Great American Industries*, 855 F.2d 987, 995 (2nd Cir. 1988). Accordingly, the particularity requirement of FRCP

- 27 -

9(b) does not apply. *In re Prison Realty Sec. Lit.*, 117 F.Supp.2d 681, 689 (M.D. Tenn. 2000) ("Fraud ... is not a necessary element of §14(a) claim and, therefore, does not have to be pled pursuant to Rule 9(b)."); *Salit v. Stanley Works*, 802 F.Supp. 728, 733 (D. Conn. 1992) ("Since fraud need not be proven ... Rule 9(b)'s particularity requirement does not apply.").

Honeywell does not argue that 15 U.S.C. §78u-4(b)(2) of the Reform Act requires particularity in allegations of negligence at bar.

There are three reasons why the Reform Act, 15 U.S.C. §78n-4(b)(2), which requires particularity in allegations of defendants' state of mind in actions for money damages, has no application at bar. First, Honeywell does not cite this sub- sub-section; second, we do not seek money damages, and, third, negligence is not a "state of mind," as the statute addresses, <u>Prosser and Keeton On The Law Of Torts</u>, §31, p.169 (5th ed. 1984). Negligence is a matter of conduct that fails to conform to the standard of reasonable care. It includes thoughtlessness, inadvertence, inattention, and oversight. It is different from scienter, willfulness, intent, malice, and recklessness, which are states of mind. <u>Black's Law Dictionary</u>. For example, if the individual directors of Honeywell failed to read the Proxy Statement, that was negligence on their part. It is their conduct that we question, not their minds. A driver who fails to watch where he is going and has a wreck is negligent, no matter how pure are his thoughts.

Honeywell tries to enter through the back door to invoke 15 U.S.C. §78u-4(b)(2), which it does not even cite, by reference to a Third Circuit case, applying that provision to claims under 15 U.S.C. §78n(a), §14(a) of the Act, and 17 C.F.R. §229.14a-9, Rule 14a-9, where the complaint did allege fraud. *In re Rockefeller Center Properties, Inc. Sec.Lit.*, 311 F.3d 198, 205, 212 (3rd Cir. 2002) (allegations of concealed intent in a proxy statement seeking stockholders' approval of a merger). But Honeywell does not even make the assertion that the complaint at bar sounds in fraud.

## CONCLUSION

At bar, the directors proposed to the stockholders "an undertaking of great importance, but nobody to know what it is." Loss, idem. Their conduct falls far short of the disclosure standards required by the Third Circuit.  Accordingly, plaintiff respectfully requests the court to deny the motion to dismiss.

BALLON STOLL BADER & NADLER, P.C.
Attorneys for Plaintiff


By _____
Dwight Yellen (DY 6547)
1450 Broadway — 14th FL
New York, New York 10018-2268
(212) 575-7900

Dated: New York, New York
April 27, 2004

Of Counsel:
A. Arnold Gershon, P.C.
1450 Broadway — 14th FL
New York, New York 10018-2268
(212) 575-7900

- 29 -